Hello, morning, morning is 520415 people versus Brown arguing for the appellant is Tiffany Green arguing for the athlete is Max Miller. Each side will have 10 minutes for their argument. The appellant will also have 5 minutes for rebuttal. Please note only the clerk of the court is permitted to record these proceedings today. Good morning. Good morning. May I please the court. My name is Tiffany boy green and I represent Christie Brown in this matter. I'm going to focus my argument today on. For conviction for criminal abuse or neglect of an elderly person, but I'll be happy to answer any questions the court has on the other issues. In order to be convicted of criminal abuse, or neglect of an elderly person, the state needed to prove that. 1, Christie Brown was a caregiver for Brown Blake and ship and 2 that she knowingly failed to perform actions necessary to keep him alive. The state did not prove this case because it did not prove beyond reasonable doubt that she was a caregiver or that she had the represent mental state of knowledge. A caregiver is defined under the statute as a person who has a duty to provide care for an elderly person. Here, Christie was was not a caregiver because Ron did not want her as. Acting in that capacity instead, he designated 2 other adults, Mason Brown, his nephew who lived in the same home as him. And a friend, Justin Tappan, who came to the house regularly. And they were both caregivers as defined by the statute. He formalized this agreement. By giving Mason and Tappan power of attorney for his medical care and his decisions. The power of attorney in this case is what really sets this case apart from others. It showed that Blake and ship wanted to exclude Christie from his care. She cannot and she cannot have a duty where he specifically chose to exclude her. If we use the states interpretation of the statute and find that she's a caregiver, simply by virtue of the fact that she lived in the same house with him and was a relative. We'd be imposing responsibility on her without authority. We want people to be able to choose who takes care of them. And we don't want to interpret this statute as forcing care upon somebody against their wishes. We also know that he did not want her involved in his care because there were pages and pages of text from Blake and ship's phone that were admitted at trial and when she told Mason and Tappan. What he needed and want, whether it was medicine, food calls to the doctor, everything he needed. There was not a single text to Chrissy or from Christie. He just did not want her involved in his care. He also had listed in some of the documents that Mason Brown was his next of kin, but he never mentioned Christie and any of those documents. Under the state's interpretation of the statute and definition of caregiver, Christie would have to move out of the house or have him move out of the house to avoid criminal liability under these circumstances. And she actually, she did she went to an attorney and she tried to get their living, their living interest separated, but they had been left the house as tenants in common. And under that circumstance. They had equal right to the house, and she had no authority to get him out. The attorney felt that she could probably get a order of protection to get an order of protection against him. Likely, because of his hoarding, but to do that, she would have to file a partition suit and that was simply too costly for her to. To do so, instead, they coexisted in this house. They lived in separate areas of the house. He apparently built a wall with garbage bags where he was trying to keep his room separate from hers. And then how to gate to the kitchen, does it play any role in our analysis that the defendant. Is a nurse and maybe had a higher understanding of what was required of what was necessary. It does not it should not play into the analysis because Blake and ship was also a nurse and he knew exactly what he needed and any knowledge that she would have had because of her profession. He also would have had. He was mentally competent, the state conceded this and closing arguments. In the trial court, he knew what he needed and he had this wording problem, um, which created an unsanitary. Unsanitary condition for for his room, and in fact, when the police officers who went to search the house where they are, Christie told them. I can't give you access to his room until he, until I get approval from either Mason or. And the police officer agreed this was a reasonable. Action on her part, considering that she did not have. Power of attorney, and he had specifically designated to other individuals. As his caregivers, so. This fact also goes to Christie's mental state of knowingly. In order to find her criminally responsible. The state needs to prove that she acted knowingly and causing his death, which means that. With practical certainty, she. Knew that his death was imminent and that her failure to take action would result in his death. She had no way of knowing the specifics of what he needed or his illness or or any of those details we see in these pages of text that. Mason and Chapman were the people he told. About his needs every day, they were in contact several times a day. They came to the house several times a day to help him with various tasks. And to give him medicine, they called the doctor or took him to the doctor when he needed that. And those were the people who had the requisite mental state to know his condition and. Detail Christie didn't go into the room in any way because she was not welcome in that room. So, she really had no way of knowing. It appears. That in this case, the air conditioner breaking certainly played a role in and Blake and chip staff. That heat seems to have aggravated his conditions and his chronic illnesses, but Christie was the 1 saying we should go to a hotel room. We need to get into a hotel room here. And he said, no. He was directing Chapman and Mason to have somebody out to fix the air conditioner and to get a lot of fans and cold drinks, which they, which it appears they were doing to a certain extent. So. He did not want to do what Christie suggested they all needed to do under those circumstances. And again, this is a mentally competent individual who's making his own decisions. What about the count involving the animals? Granted, Mason was the owner of the animals, but the defendant took the animals to the vet paid for the vet bills did several things would indicate. She maybe had responsibility for the animals as well. There's certainly evidence that she assisted him in caring for the animals, but again, these were 16 year old pets and. The state only had evidence that on 2 occasions, she had. Allowed her credit card to be used for the veterinary bills. The defense actually presented some evidence that. She 1 time assisted with taking the dogs to the vet just a couple months before. The before Blankenship's death, but in that case, they had. There was evidence that was unrebutted that. Chrissy was telling Mason, you need to let these, these, the vet put these dogs down or in that case, it was 1 of the dogs put him down if there's something wrong. And Mason said, no, I will not do that. And the doctor, the veterinary. Personnel that testified at trial who had treated the dog said Mason Brown is listed as the owner of these of these dogs. He's the 1 that was tasked with owners duties and. He nobody disputed that he was the owner as an adult. This wasn't a situation where he was a minor being delegated responsibilities. He was an adult. So, yes, there's evidence that she helped him on a couple of occasions, but I don't think that that makes her responsible. Under the under the statute for their for their veterinary care. I also want to point out that there was a lot of testimony about how awful the conditions were in the porch at that time. Chrissy and her daughter left that house the night that that Blankenship died and the dogs were kept in the porch. Um, where Mason would take care of them by the time those dogs were discovered. 3 days later, they had been left unattended for an unknown amount of time. Mason and Tavon were at that at the house and stayed there the night that Blankenship died. So, when she left to go to a hotel with her adult daughter. They were living, they were in the porch there with 2 other individuals. So, we don't know how long that they had been in that porch with the, you know, without access to the outside. And what really is that issue here is their veterinary care. There's no evidence that Chrissy knew they needed. That they had eye infections or ear infections or whatever other medical conditions. They had it. It just seems that. She, you know, she took care of her daughter and that was her responsibility and she was still working full time as a nurse. And Mason was in charge of the dogs that were his and with Tavon cared for cared for Blankenship. So, for those reasons, we would ask that this court reverse outright both her convictions for criminal abuse or neglect of an elderly person as well as her conviction for aggravated. Both convictions for aggravated cruelty to a companion animal. All right, thank you questions. All right, you'll be providing an opportunity for about a moment. Mr. Miller, you're ready to proceed. Yes, your honor may do so. May please the court counsel. My name is Max Miller and I represent people of the state of Illinois. The state provided sufficient evidence from which a rational trial fact could have found the defendant guilty of the offense of criminal abuse or neglect. Defendant challenges basically two elements of this offense that she argues whether or not it was a caregiver and whether or not she had the requisite mental intent. So, beginning with whether or not she was a caregiver. We have the statutory definition, which was provided to the jury and jury instructions defendant didn't raise an issue with the jury instructions or anything like that. The word caregiver means a person who has a duty to provide for an elderly person's health and personal care at such person's place of residence, including but not limited to food and nutrition, shelter, etc., etc., including a broad relative. We can really stop at shelter here, okay, because the defendant is the one who provided this shelter. Now, how did she provide the shelter? Well, we have by stipulation their brother and sister and that she lives there. Okay, but we have testimony from defendant's witness. The attorney, his name was James Ayers. He was an attorney in Monticello. He testified that they share ownership of the property in its totality. They each have equal rights to possession of the whole house. Can't divide the house in half and say this will be his side and her side. It just doesn't work that way is his exact quote. Each person had a right to be everywhere and anywhere on those premises. So, any sort of care that's going to be or that was tendered to defendant has to go through the defendant or to blanket ship. There had to go through defendant because she is the only person besides he who has the authority of the house. Did he make the other two people powers of attorney? One of them, I believe, your honor, but again, that still would not provide them necessarily access. I thought he designated Mason and Tapman both as his power of attorney to make medical decisions. If he makes that designation, doesn't that supersede the fact that they had ownership in the house together? I would say that it certainly would supersede maybe decisions that need to be made on medical care, things of that nature. But certainly, I don't see how that would supersede her authority into control or authority over the house itself or access to that house or anything like that. If Blankenship was telling them I need a certain amount of medical, something like that, they would seek that for him. But again, while they're living in this house, it's not something that he has some greater right or any decision of that nature. So, she is a blood relative who resided with him. The only question is whether she knew or reasonably should have known whether his physical impairment that he was unable to provide for his own health and care. Tapman testified that he remembered arguments when defendant wanted Blankenship to move out, that he wanted to sign over his half of the house in case he'd go to a nursing home because they could take the house since his name was on it too. Now, a rational trier of fact could conclude from that testimony that defendant was aware of his health and dependents were such that there's no security and a stable future for him living there. Tapman asked the defendant why there was not an ambulance there when he found the defendant outside of the day he died. And defendant said not to call 911 until the place had been cleaned up. Again, a rational trier fact could have concluded defendant was aware of the shocking conditions that are very clearly outlined in the brief that Kiefer and Schumard would testify to. And the living situation of Blankenship just is something that the defendant couldn't have possibly shielded herself from. You know, as Kiefer will testify, there's a strong smell of urine, mold, and feces before you even enter the home. A defendant slept in the room that provided access to Blankenship's room in the living room right there. So, to say that she was unaware when the police are testifying, they could smell before they even entered the house, just kind of beggars belief. A rational trier of fact could conclude that she knew the precarious situation that not just his room but that that house was in as we know when we get into the conditions of the ports the dogs were living in. So, a caregiver is just a person who has a duty to provide for health and personal care in something including shelter. That defendant didn't raise in their opening brief an argument in statutory interpretation or an issue of these jury instructions, so this falls under that statute. She was providing care in the form of shelter. It's her house as much as it was his equally. And so, looking at the evidence in light most favorable to the state, a rational trier fact could have made that conclusion. You know, defendant can present alternate theories or things like, but the question is whether or not or whether a rational trier fact could have made that conclusion. Secondly, regarding the requisite mental state, knowledge is obviously proven by circumstantial evidence. The court's well aware of the standard. The conditions of the house aren't disputed. They're described in graffiti by Kiefer, Dunn, Schumard, McPheeters. At the outset, the court should note that the circumstances of that show that defendant was consciously aware that he was living in a situation that put him at the risk of death. The conclusion supported by Tatman's testimony that she suspected Blankenship wouldn't be able to continue living with them, would need to go to a nursing home, that defendant said not to call 9-1-1 to clean up the place. This just would allow the rational trier fact to see that his health was in serious jeopardy due the unhygienic condition of the household. Now, I'm suspicious of the idea that the defendant is the caregiver of the victim, but I'm also reluctant to substitute my judgment for that of the jury who heard all the evidence and made a verdict here. What's our standard review in this case? How do we evaluate this? Sure. So obviously, we'll view this, the evidence in this is viewed in the light most favorable to the state. So we're just looking, any rational trier fact found the elements of the fence beyond reasonable doubt. We're leaving credibility determination to the trier fact, and a guilty finding may be supported by any reasonable inferences that could be drawn from the evidence. And so, you know, what is that evidence? The evidence is that one of the two alternative caregivers that's suggested by the defendant is, you know, the son of the defendant, somebody who we have testimony that she provided rides, she provided money. So it's a bit confusing to say that he was one of the caregivers, you can say he got him food. But it's certainly possible that the jury inferred from seeing the living situation going on in that house, that he was, you know, at least in fact, a dependent on the defendant for any sort of treatment that he was giving blankenship. And as for the other supposed caregiver, they did not live in that, you know, they're just a friend, they're not somebody related, I believe it's great. And so, in that way, you know, we just have a situation that is set up where the owner of the house, who lives in the bed in the room outside where blankenship died, is said to have no knowledge of what was going on in that room, wasn't aware of the fact that not just that room, but porch and the entire house had smells, had air conditioning that wasn't working, had that blankenship himself was in such a state of health that the forensic examiner, so one of the causes of death was medical neglect, which was a great point of contention to trial and they went into great detail. I'm having trouble wrapping my head around the idea that the state conceded the victim was competent. And he designated someone else to be his caregiver, how we make the jump to his sister who lives there too, has to jump in and make decisions for someone who's competent and made other designations, how do we make that leap that she's the caregiver? Yes, your honor. Well, so certainly the state conceded that he was mentally competent, but that doesn't mean that he was physically competent, right? So he could not necessarily seek the things that he needed on his own. He was texting what he needed, he texted he wanted hearties for breakfast, he texted he needed some medicine, he was texting the things he needed. Sure, he was texting the defendant's son most a lot of the time and also tap me, but who was his designated caregiver on the POA? Yes, your honor. But defendant's son being the caregiver, again, any care that he could provide, it's unclear by what lens that would be care that he was giving without the assistance of his mother, because he's not able to get around on his own, he's not able to pay for things on his own. Those are just things that were before the caregiver tapman, the access to the house would be provided by Brown, the defendant. So, you know, at the end of the day, it's kind of like, the buck stops at Brown for who has access to blanket ship, there's no real way, if she did not want these people to have access to, I mean, he has a equal right to allow people into the home, but there's a competing interest here with this full sharing of the premises by a blood relative. And I see that I'm running short on time here, so the state would just rely on its brief for the second and third issues, unless this court has any more questions, we respectfully ask that they affirm. Thank you. Questions, Justice Welch? No questions. All right, thank you. Ms. Green, rebuttal? Yes, sorry. Okay, so with respect to the state's argument, they concede that a power of attorney would supersede any statutory authority to provide medical care. So, at this point, the state's argument really comes down to the fact that she was co-owner of this house, and the state seems to argue that because she was co-owner of this house with him, somehow all medical care had to go through her, and that she was responsible for the conditions of the house. Blankenship was also equally responsible for the conditions of that house. He had a duty to her just as much as she would to him to keep the house habitable. There was plenty of testimony that his room was by far the worst room in the house. The rest of the house, the testimony was that the rest of the house was a bit cluttered, but even in the portion of the room where she lived with her daughter, there was folded laundry. She was doing what she could to keep her living space clean. He would not let people take anything out of his room. There was unrebutted testimony that he would shake a stick at anyone who tried to do it, that he would get angry about it. Even the state's at sentencing said, yeah, for as long as I can remember, he was a hoarder. He wouldn't let people take things out of his room. Christy didn't like living in this situation at all. That's why she went to an attorney to try and separate their interests, and it simply could not be done because it was too expensive. So she coexisted there with him, but she was not the one who was responsible for the conditions of his room. He had that responsibility, and he refused to clean it up. Additionally, the state argues that she was the one who gave all access to Blakenship, had to go through her because she was an owner of the house. Mason lived in that house, and Blakenship had similar authority to let anybody in that he needed or wanted. It was clear that he designated both Mason Brown and Justin Tapman as his powers of attorney. It was both of and he allowed them into the house. Let me ask you the flip side of the question. I asked Mr. Miller, I'm suspicious whether or not she was truly the caregiver, but if the test is viewing the evidence in the light most favorable to the prosecution, how do we substitute our judgment for the jury's verdict that found she was responsible? I think that this court can affirm or reverse a conviction based on any evidence in the record, and I know that the jury did find her responsible, but at the same time, this court has an obligation to review the evidence in totality and look at the situation of this case. Is that the test, review the evidence in the totality? I thought it was review it in the light most favorable to the state. Correct. Yes, that is the standard, but even under the forgiving standard of the light most favorable to the state, here where there is a power of attorney, the court needs to look at the facts and that he did in fact designate other people to be his caregiver. Perhaps the jury did not understand the responsibilities of being power of attorney. The defense certainly presented that evidence, but maybe they didn't really truly understand what authority that was giving Tatman and Mason. I don't know, but even under the lenient standard of light most favorable to the state, we cannot allow the statute to be interpreted in a situation where we are holding people responsible for somebody's care without authority. What if the situation was reversed and she needed care and she wanted her son doing it? She wouldn't want her brother who she had this very strained relationship with due to the abuse that happened when they were growing up taking care of her. We cannot impose a duty in the statute and the statute does say duty. Here, this power of attorney alleviates her from that duty and that is an element of the offense. I briefly wanted to respond to the state's argument as well about the ambulance and that it shows that she knew the conditions were bad in the house. Nobody is disputing that she knew the conditions were bad in his room. Absolutely, they were horrible. She was miserable living in that condition and breathing that same air as the rest of them, but if she knew he had a do not resuscitate order in place and she also knew practically speaking, it was difficult to get into that room. The fact that she said you should clean the room up before the paramedics come does not mean that she knew there was something that she was somehow responsible. It means she knew the conditions were horrible by his own choosing. For those reasons, we would ask that this court reverse her conviction outright for criminal abuse or neglect of an elderly person as well as the animal, the convictions related to neglect of the animal. If this court does not have any other questions. Thank you. Justice Welch, questions? Thank you. This is a difficult and sad situation. We will consider the argument you made in your today. We will take the matter under advisement and issue a decision in due course. Thank you.